IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 11 |
| | : |
| UNITED PRODUCTS CORP., | : |
| | : |
| DEBTOR(S) | : BANKRUPTCY NO. 03-36622 SR |
| | : |
| UNITED PRODUCTS CORP., | : |
| PLAINTIFF | : ADVERSARY NO. 04-666  SR |
| | : |
| V. | : |
| | : |
| SOUTHEASTERN PENNSYLVANIA | : |
| TRANSPORTATION AUTHORITY, | : |
| DEFENDANT | : |
| | : |

# OPINION

By:   STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

## I.    Introduction

Before the Court is Defendant Southeastern Pennsylvania Transportation Authority's ("SEPTA") Motion for Partial Summary Judgment ("Motion").  Debtor/Plaintiff United Products Corporation ("UPC") opposes the Motion.  The Court held a hearing on this matter on June 21, 2005.  For the reasons stated below, the Court will grant the Motion.

## II.    Background

This case arises from an August 11, 1995 Agreement for Supply of Materials and/or Equipment ("Agreement") between UPC and SEPTA in which UPC agreed to provide 231 new interior "kits" or "car sets" for SEPTA's fleet of Silverliner IV rail cars.  Prior to the Agreement, SEPTA, in an Invitation to Bid, sought bids for the refurbishment of the interiors of the railcars.  *See* Ex. 19 to SEPTA's Motion (Invitation to Bid).  The bids were to be a "firm fixed price" bid, meaning that the bidders were expected to bid on the exact price for

which they would perform the interior renovation.  The project involved a design and build situation where the bidders were expected to propose a design for the new interiors and, once accepted by SEPTA, supply the new interiors in "kit" format to be installed by SEPTA workers.  Along with the Invitation to Bid, SEPTA prepared a set of Engineering Specifications to be used by potential bidders in connection with the preparation of their bids.  *See* Ex. 8 to SEPTA's Motion (Specifications).  The Specifications outlined the general parameters of the Project but did not provide any detailed measurements or item-by-item requirements.  *Id.*

UPC submitted a bid of $55,624 per car plus an additional $1,036,612 for start-up charges.  *See* Ex. 18 to SEPTA's Motion (UPC bid).  UPC's bid was the lowest responsible bid on the project, approximately $5 million less than the next lowest bidder.  *See* Ex. 12 to SEPTA's Motion, at 15 (Furry Dep.).  SEPTA awarded the contract to UPC, and UPC assured SEPTA that it could complete the project for the firm fixed price.  *Id.* at 16-17.  The project proceeded over four separate phases spanning from August 1995 through July 2002.  By 2002, UPC had delivered all of the car sets, and SEPTA had paid the full firm fixed price.

On June 22, 2004, UPC filed the instant Adversary Complaint against SEPTA, asserting claims of breach of contract, promissory estoppel and waiver.  In its Complaint, UPC seeks to obtain sums for cost utilization (i.e., delay damages) from SEPTA attributable to project delays it claims were caused by SEPTA.  These sums are separate from the firm fixed price.

SEPTA seeks summary judgment on UPC's claim for cost utilization, which it argues runs afoul of the "no delay damages" provision in the Agreement.  UPC counters that the

"changes" provision contained in the Agreement–not the "no delay damages" provision–applies here.  Alternatively, UPC argues that the Agreement is ambiguous and therefore should be construed against SEPTA, the Agreement's drafter.

SEPTA also seeks summary judgment on UPC's promissory estoppel claim, arguing that such a claim is impermissible where a valid contract exists.  For the reasons set forth below, the Court will grant SEPTA's Motion as to both the cost utilization and promissory estoppel claims.

## III.    Provisions at Issue

The "no delay damages" provision on which SEPTA relies states:

> If Contractor shall be delayed in the completion and performance under this Contract by reason of unforeseeable causes beyond his control and without his contribution, neglect, fault, or negligence, including but not restricted to acts of God, acts of neglect of SEPTA, acts of neglect of any other contractor, fires, floods, epidemics, quarantines, strikes, or freight embargoes, the time herein specified for completion of Contract Performance may be extended at the reasonable discretion of SEPTA, by such time as shall be fixed by SEPTA in writing. The Contractor shall not be entitled to any damages, compensation, or adjustment from SEPTA on account of any delay or delays, including delays in payment to Contractor, resulting from any of the aforesaid clauses.

*See* Agreement, at A-3 (¶ VIII - DELAY IN COMPLETION BEYOND CONTRACTOR'S CONTROL) (emphasis added).

The "changes" provision on which UPC relies states in pertinent part:

1.    SEPTA, without invalidating the Contract, may order changes within the general scope of the Contract consisting of additions, deletions, or other revisions, with the Firm Fixed Price(s) set forth in Exhibit A and the Contract time of performance being adjusted accordingly.  All such changes shall be authorized by Change Order, and shall be executed under the applicable conditions of the Contract documents.

3

2.      It is understood and agreed that refinement or detailing will be accomplished from time to time with respect to the Specifications.  <u>No adjustments in the Firm Fixed Price(s) set forth in Exhibit A or the Contract time shall be made unless such refinement or detailing results in changes in the scope, quality, function and/or intent of the Specifications not reasonable inferable or foreseeable by the Contractor</u>.

*See* Agreement, at A-7 (¶ XX, A - CHANGES) (emphasis added).

## IV.    <u>Discussion</u>

### A.    <u>Cost Utilization</u>

The Court must address first whether the Agreement is ambiguous.  If so, the Court must then determine the proper construction of the Agreement.  If not, the Court must determine which provision applies.

#### 1.    <u>Ambiguity</u>

In the context of a contract dispute, the court's role is first to determine as a matter of law whether the contract terms are ambiguous.  *See Tuthill v. Tuthill*, 763 A.2d 417, 420 (Pa. Super. Ct. 2000) (omitting citations).  Where the words of a contract are clear and unambiguous, the parties' intent is to be found only in the express language of the agreement.  *See Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993).  The court must construe a contract as written and may not modify the plain language of the contract under the guise of interpretation.  *See Little v. Little*, 657 A.2d 12, 15 (Pa. Super. Ct. 1995).  Moreover, when clauses of a contract conflict with one another, they should be construed, if possible, as consistent with one another. *See In re Binenstock's Trust*, 190 A.2d 288, 293 (Pa. 1963).

Where the contract terms are ambiguous, however, the court is free to receive extrinsic evidence, *i.e.*, parol evidence, to resolve the ambiguity.  *See Krizovensky*, 624

4

A.2d at 642.   A contract should be found to be ambiguous only if it is fairly susceptible to

different constructions and capable of being understood in more than one sense.   *Id.*

(citations omitted).   If the contract, or any part thereof, is susceptible to two logical

constructions . . . [a court should] interpret the contract against the drafting party."   *Sabad*

*v. Fessenden*, 825 A.2d 682, 688 (Pa. Super. Ct. 2003).

Ambiguity within a contract may be "patent" or "latent."   *See Krizovensky,* 624 A.2d

at 643.   A patent ambiguity appears on the face of the contract and is a result of defective

or obscure language.   *Id.*   By contrast, a latent ambiguity arises from collateral facts that

make the meaning of a written contract uncertain, although the language appears clear on

the face of the contract.   *Id.*

UPC argues that the "no delay damages" and "changes" provisions are in

irreconcilable conflict because the "no delay damages" provision prohibits damages on

account of "unforeseeable" causes beyond the contractor's control and without his

contribution, while the "changes" provision allows remedies for change orders that affect

the scope, quality, function and/or intent of the specifications "*not reasonable inferable or*

*foreseeable by the Contractor*."   *See* UPC's Response to SEPTA's Motion ("UPC

Response"), at 12.   In other words, UPC argues that the provisions conflict because each

provision addresses unforeseeable actions that result in a change in the time of

performance under the contract.

Conversely, SEPTA argues that the two provisions are consistent and pertain to two

different scenarios.   According to SEPTA, the "changes" provision is intended to provide

for additional payments or time if, for example, SEPTA submits a change order for an

additional item for the railcar interiors.   The "no delay damages" provision, on the other

5

hand, deals with unforeseeable delays to the project generally. Because SEPTA did not submit a change order or otherwise mandate any changes to the Agreement terms, it argues that the change order provision is inapplicable.

In viewing the language of Sections VIII and XX, the two provisions are not patently ambiguous. As discussed above, a patent ambiguity must appear on the face of the contract and be the result of defective or obscure language. *See Krizovensky,* 624 A.2d at 643. Here, neither party suggests that the words contained in either provision are defective or obscure, nor is there any evidence of such ambiguity. The Court therefore finds that the provisions are not patently ambiguous.

With respect to latent ambiguity, UPC argues that the provisions become ambiguous when applied because each addresses unforeseeable delays in different ways. The difference, however, does not create a conflict. To the contrary, the provisions deal with different situations and prescribe different results. The "no delay damages" provision applies generally to prohibit recovery of damages that may be incurred as a result of unforeseen delays on the project. The "changes" provision only qualifies this general provision when a certain predicate condition exists, namely, a change order. If no change order exists, the different treatment for unforeseen events does not apply. Likewise, if a change order exists, the provision does apply. The differing treatment of the two situations does not represent a conflict. Rather, it represents simply a refinement in a more specific scenario of the general "no delay damages" rule. Accordingly, the Court finds that the Agreement is neither patently nor latently ambiguous.

2.    The "changes" provision does not apply

6

Having determined that the contract is not ambiguous, the Court will next turn to which provision controls in the instant case.[1]  The "changes" provision applies only if SEPTA had submitted a change order mandating an "addition, deletion or other revision" that changed the "scope, quality, function and/or intent" of the contract specifications. Although it is undisputed that SEPTA never submitted a change order,  UPC nonetheless argues that SEPTA *should have* submitted one because SEPTA's actions resulted in a change to the scope, quality, function and/or intent of the parties' Agreement.[2]

It is undisputed that the Agreement speaks to *delivery* of car sets:

> <u>Delivery</u> of production material to commence immediately after installation on the seventh car and <u>will commence at the rate of seven (7) car sets per month</u> until completion of the order.

*See* Agreement, at A-16(b) (Revised Exhibit "A").  It is also undisputed that the Agreement does not speak to *installation* and does not require SEPTA to install the car sets at any given rate.  Nonetheless, UPC argues that the parties understood that the project was to proceed in four phases, each phase lasting one year, and that such  schedule would have required that SEPTA install the car sets at a rate of seven per month. *See* UPC Response, at 6.  UPC argues that SEPTA's failure to install seven car sets per month amounted to a change in the scope of the Agreement that should have been handled by a change order. UPC further argues that SEPTA's change to the monthly installation rate was tantamount

---

[1] Because the Agreement is not ambiguous, the Court need not look at extrinsic evidence or surrounding circumstances to ascertain the intent of the parties.

[2] In support of its position, UPC argues that it requested change orders on several occasions but SEPTA repeatedly dodged its requests.  *See* UPC Response, at 4; Ex. 8 to SEPTA's Motion, at 000211 (Open Price Adjustments) and 49 (UPC request for cost increases).

to a change in the monthly delivery rate.

In support of its position, UPC relies on the following: (1) SEPTA's project engineer and manager's deposition testimony; (2) the Invitation to Bid; (3) the Agreement terms; and (4) the delivery rate. UPC relies first on the testimony of Aldo Carpenetti, SEPTA's senior project engineer and project manager. Carpenetti testified that SEPTA's Wayne Junction facility was originally scheduled for seven car sets per month. *See* Ex. 14 to SEPTA's Motion, at 42 (pages167-68) (Carpenetti Dep.). UPC argues that Carpenetti's testimony establishes that SEPTA understood itself to be contractually obligated to both accept *and install* seven car sets per month. *See* UPC Response, at 6.

UPC also relies on the Invitation to Bid. The Invitation to Bid included a schedule of performance indicating that the four contract phases were to have been completed in the years 1995 through 1998 respectively. *See* Ex. 19 to SEPTA's Motion, at PF2-5/93 (Invitation to Bid). In addition, UPC relies on the Agreement's use of the word "years" in several significant locations. For example, Revised Exhibit "A" refers to the four contract phases as "years." *See* Agreement, at A-16 (Revised Exhibit "A"). Moreover, the delivery schedule refers to each phase by contract year. *Id.* at A-16(a) ¶ 1. These references to "years", UPC argues, corroborate its contention that both parties intended that each phase of the contract was to last one year before the next phase would proceed. *See* UPC Response, at 6.

Finally, UPC argues that the monthly delivery rate further supports its position. If, for example, SEPTA had proceeded to install at the rate of seven car sets per month (same as the delivery rate), UPC argues that Phases I and II would have been completed on time. UPC concludes that, by failing to maintain that monthly rate of installation, SEPTA derailed

8

the project and interfered with the four year, four phase delivery schedule. *See* UPC
Response, at 7.

In response, SEPTA counters that it did not issue a change order and therefore the
"changes" provision does not apply. Alternatively, SEPTA argues that it had no contractual
obligation to install seven–or any other number of–car sets per month and therefore it did
not alter the scope of the Agreement or otherwise act in a manner that would have
warranted a change order. Although SEPTA concedes that, when it initially put the project
out for bid, it anticipated that it would receive the necessary funding, and therefore
manpower, to install seven car sets per month (Tr. at 5), it maintains that it was not
contractually bound to any rate of installation.

A review of the Agreement supports SEPTA's position. The Agreement speaks only
to *delivery* of car sets. The Agreement, by its terms, does not bind SEPTA to any given
rate of installation. UPC's reliance on an understanding of the parties that is not captured
in the terms of the Agreement is therefore misplaced.[3] Although UPC may feel that the
parties intended to adhere to a four-year, four-phase timeline, the Agreement's explicit
terms belie such an understanding–as neither a four-year deadline nor a required rate of

---

[3] Indeed, the Agreement contains an explicit integration clause that provides on
page one that "[t]he Contract Documents form the Contract and represent the entire and
integrated agreement between the parties and, except for substantial representations made
by the Contractor upon which SEPTA was entitled to rely in making the decision to award
this Contract to the Contractor, <u>supercede all prior negotiations, representations, or
agreements, either written or oral</u>. . . .". *See* Agreement, at A-1. In the face of such an
explicit integration clause, UPC cannot rely on negotiations during the bidding process that
ultimately never became terms of the parties' final agreement. Specifically, UPC cannot
rely on the Invitation to Bid terms, Carpenetti's understanding or other pre-contract matters.
Furthermore, Carpenetti's testimony does not alter the fact that the Agreement does not
bind SEPTA to a rate of installation.

installation was ever made part of the Agreement.

With regard to the use of the term "years" in the Agreement, and UPC's interpretation of the rate of delivery, neither acts as a clear, written expression of the parties' intent to mandate completion of the phases by specific dates. Rather, a more sensible reading of the Agreement suggests that the four year timeline was a target for the performance of each phase. In fact, the parties understood the project involved an intricate and involved design process that included many opportunities for potential delays. *See* Ex. 8 to SEPTA's Motion, at 147-49 ¶ 1.6 (Specifications). As long as SEPTA met its obligation to accept *delivery* of seven car sets per month–and the evidence shows not only that SEPTA met its contractual obligations by accepting as many car sets as UPC delivered but also SEPTA timely paid UPC for every car set delivered–the Court will not read into the Agreement obligations that are otherwise not present. *See* Ex. 12 to SEPTA's Motion, at 17-18, 20-21, 51-53 (Furry Dep.); Ex. 15 to SEPTA's Motion, at 50, 102 (Johnson Dep.).

In light of the foregoing, UPC cannot demonstrate that SEPTA was obligated to install seven car sets per month. Absent such an obligation, SEPTA cannot be found to have altered the scope of the Agreement with an "addition, deletion or revision" to the contract by *not* installing seven car sets per month. No change order, therefore, was warranted. With no change order, the "changes" provision is inapplicable.

Furthermore, UPC has failed to show how it has been harmed by SEPTA's alleged modification of the installation rate.[4] Although UPC claims it has incurred monetary

---

[4] UPC argues that Section XX of the Agreement prescribes the means of calculating contract credits in the event of a change order. Specifically, sub-section D(1)(b) of Section XX authorizes payment of a contract credit "i[f] unit prices are stated in the Contract
(continued...)

damages and suffered hardship, it has failed to introduce any evidence, by affidavit or

otherwise, delineating how it was harmed.   UPC's President, Joseph Egan, testified

generally at his deposition that the damages for "cost utilization" represent costs incurred

"when production slows down unexpectedly," including increased wage and employee

costs and the costs associated with carrying inventory within UPC's facilities.   *See* Ex. 11

to SEPTA's Motion, at 13 (Egan Dep.).   At the hearing, UPC's counsel also made reference

to an alleged impact on UPC's ability to manufacture, deliver or receive payments for the

car sets, and an alleged impact on UPC's decision-making concerning the magnitude of

its workforce, its financing of materials, and warehousing space (Tr. at 10).   Despite these

general averments of harm, however, UPC has failed to substantiate these claims with

evidence.[5]   Instead, UPC merely counter-designates deposition testimony of SEPTA

witnesses confirming that SEPTA originally intended to install seven car sets per month.

That testimony neither supports nor quantifies UPC's damages claim.   Absent more, the

---

[4](...continued)
Documents or are subsequently agreed upon, and if the quantities of changed Material
and/or Equipment proposed will create a hardship on SEPTA or the Contractor . . . ."
*See* Agreement, at ¶ XX (p. A-8).  UPC argues that it is entitled to a contract credit because
SEPTA's modification of the rate at which it accepted *delivery* of the car sets imposed a
financial "hardship" on UPC.  *See* UPC Response, at 3.  The evidence is clear that SEPTA
never modified, nor could it, the rate of delivery.  With respect to its purported modification
of the installation rate, UPC has failed to present evidence substantiating how it has been
harmed.  *See infra.*

[5] Indeed, the evidence shows that not only did SEPTA always accept all car sets
UPC delivered, SEPTA pushed UPC's invoices for the car sets through its accounting
department to be paid within 24-48 hours rather than the 30-45 days allowed.  *See* Ex. 15
to SEPTA's Motion, at 50, 102 (Johnson Dep.).  Moreover, the testimony of Mark Furry,
UPC's Vice President and Vice President of Finance, was that UPC rarely was able to
produce seven car sets per month and that SEPTA was constantly "hounding" UPC to
deliver more.  *See* Ex. 12 to SEPTA's Motion, at 17-18, 20-21, 51-53 (Furry Dep.).

Court cannot find that UPC has raised material issues of fact concerning its cost utilization claim sufficient to overcome summary judgment.

For these reasons, and the reasons outlined below, the Court will grant summary judgment in SEPTA's favor on UPC's cost utilization claim.

3.    The "no delay damages" provision does apply

Logically, because the "changes" provision does not apply, the "no delay damages" provision controls the instant dispute. The "no delay damages" provision states that the contractor shall not be entitled to damages for delays resulting from causes beyond its control–causes which may include acts of neglect by SEPTA. *See* Agreement, at A-3. That provision contemplates the very delays complained of here.

Under Pennsylvania law, a "no delay damages" provision in a contract is enforceable unless (1) there is an affirmative, intentional or positive interference of the owner with the contractor's work; or (2) there is a complete failure on the part of the owner to act in some essential manner necessary to the prosecution of the work. *See Grimme Combustion, Inc. v. Mergentime Corp.,* 595 A.2d 77, 82-83 (Pa. Super. Ct. 1991) (citing *Gasparini Excavating Co. v. Pennsylvania Turnpike Commission*, 187 A.2d 157 (Pa. 1963)).

Here, UPC asserts two separate cost utilization claims that are claims for purported delays on the project. UPC's first claim for $243,588 is for delays which caused Phase I to extend six months beyond the anticipated completion date. *See* Ex. 5 to SEPTA's Motion, at Tab 9 (UPC's Reply to SEPTA's Interrogatories).

UPC has shown no evidence that any delay in the completion of Phase I was the

12

result of intentional interference or "complete failure" by SEPTA.[6] <u>Neglect</u> on the part of SEPTA is expressly precluded as being a ground for damages under the "no delay damages" provision. *See* Agreement, at A-3. Thus, even construing the allegations against SEPTA in a light most favorable to UPC, there has been no showing that SEPTA's actions amounted to anything more than neglect.

Moreover, the evidence does not support UPC's allegations against SEPTA but rather indicates that UPC's own actions contributed to delays in Phase I. For example, UPC changed design firms to EDA in late 1995, and EDA's performance affected UPC's ability to perform under the contract. *See* Ex. 12 to SEPTA's Motion, at 42-43 (Furry. Dep.). In fact, UPC filed suit against EDA and its related companies alleging that EDA's negligence caused delays on the Silverliner project and caused UPC to be in default under the Agreement with SEPTA. *See* Ex. 17 to SEPTA's Motion, at ¶¶ 21, 25 (IFC Kaiser Complaint). These allegations were substantiated by a letter from UPC's President to EDA stating that the project was five weeks behind schedule because of EDA's performance. *See* Ex. 17 to SEPTA's Motion, at Exhibit B (May 2, 1996 letter from J. Egan to D. Milliron). Furthermore, the evidence shows that many of the delays resulted from UPC's failure to pay vendors in a timely manner. *See* Ex. 12 to SEPTA's Motion, at 17-18, 51-53 (Furry

---

[6] UPC relies on *Gasparini* for support. In *Gasparini*, the court held the delay damages provision was unenforceable where the defendant knew a competing contractor would be occupying the work site and ordered the plaintiff to start work in that area even though it knew it would be denied access. *Gasparini*, 187 A.2d at 161. There, the court held the defendant's actions amounted to "affirmative or positive interference" with plaintiff's ability to perform. *Id.* at 162. Here, the facts are distinguishable. The evidence in this case shows that, although SEPTA intended to receive the funding (and therefore manpower) to install at a rate of seven car sets per month, it was not able to do so. *See* Ex. 14 to SEPTA's Motion, 42 (pages 167-68) (Carpenetti Dep.). No evidence demonstrates that SEPTA intentionally interfered with the contract.

Dep.).

As to UPC's second claim for $360,697 related to delays on Phase II of the project,
UPC alleges that SEPTA's failure to install seven car sets per month caused Phase II to
extend over two years. *See* Ex. 5 to SEPTA's Motion, at Tab 10 (UPC's Reply to SEPTA's
Interrogatories). As discussed above, SEPTA was not required to install any set number
of car sets under the Agreement. Moreover, the evidence shows that, although SEPTA
initially planned to install at the seven car sets rate, it was unable to do so due to a lack of
funding and resulting manpower shortages. Again, there has been no showing here that
SEPTA's actions were anything greater than neglect. Absent that, the "no delay damages"
prohibits UPC's recovery.

Based on the above, the Court finds that the "no delay damages" provision applies
and acts as a bar to UPC's claim for cost utilization. The Court therefore will enter
summary judgment in SEPTA's favor on UPC's cost utilization claim.

B.   Promissory Estoppel

Finally, SEPTA seeks summary judgment on UPC's promissory estoppel claim.
Promissory estoppel is an equitable remedy to be used only when no contract exists.[7] *See*
*Linden v. SAP AM., Inc.*, 2004 WL 1047719, at * 7 (E.D. Pa. May 6, 2004) (citing *Rho v.*
*Vanguard Ob/Gyn Assoc., P.C.,* 1999 WL 228993, at * 6 (E.D. Pa. April 15, 1999)). Courts
have held that breach of contract and promissory estoppel claims may be pleaded in the

---

[7] To make a claim for promissory estoppel, a plaintiff must allege that (1) defendant
made a promise it should have reasonably expected to induce action or forbearance on the
part of plaintiff; (2) plaintiff actually took action or refrained from taking action in reliance on
the promise; and (3) injustice can be avoided only by enforcing the promise. *See MDNet,*
*Inc. v. Pharmacia*, 2005 WL 1385906 (3d Cir. June 13, 2005).

14

alternative, but that if the court finds that a contract exists, the promissory estoppel claim must fail.  *See Carlson v. Arnot-Ogden Mem'l Hosp.,* 918 F.2d 411, 416 (3d Cir. 1990). "Because promissory estoppel is a quasi-contract equitable remedy, it is invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise."  *Id.*

Here, there is no dispute that a valid, binding Agreement exists between SEPTA and UPC.  Accordingly, UPC's claim for breach of promises under a theory of promissory estoppel is precluded by UPC's breach of contract action.  As such, the Court also will grant summary judgment in SEPTA's favor on UPC's promissory estoppel claim.

## V.    Conclusion

Based on the foregoing, the Court will grant SEPTA's Motion for Partial Summary Judgment.

An appropriate Order follows.

BY THE COURT:

STEPHEN RASLAVICH
UNITED STATES BANKRUPTCY JUDGE

DATED: August 17, 2005

15

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 11 |
| | : |
| UNITED PRODUCTS CORP., | : |
| | : |
| DEBTOR(S) | : BANKRUPTCY NO. 03-36622 SR |
| | : |
| UNITED PRODUCTS CORP., | : |
| PLAINTIFF | : ADVERSARY NO. 04-666  SR |
| | : |
| V. | : |
| | : |
| SOUTHEASTERN PENNSYLVANIA | : |
| TRANSPORTATION AUTHORITY, | : |
| DEFENDANT | : |
| | : |

# ORDER

**AND NOW**, upon consideration of Southeastern Pennsylvania Transportation Authority's Motion for Partial Summary Judgment, and opposition thereto, and after a hearing held thereon on June 21, 2005, it is hereby:

**ORDERED**, that, for the reasons stated in the accompanying Opinion, the Motion is GRANTED.

BY THE COURT:

STEPHEN RASLAVICH
UNITED STATES BANKRUPTCY JUDGE

DATED: August 17, 2005

**MAILING LIST**:

Malcolm S. Gould, Esquire
Pelino & Lentz, P.C.
One Liberty Place, 32nd Floor
Philadelphia, PA 19103

Michael S. Henry, Esquire
Michael S. Henry LLC
2336 S. Broad Street
Philadelphia, PA 19145

George M. Conway, III, Esquire
Office of the United States Trustee
601 Walnut Street, Suite 950-W
Philadelphia, PA 19106